Approved: _Thane Rehn_ **9MAG 5056**

THANE REHN
Assistant United States Attorney

Before:   HONORABLE DEBRA FREEMAN
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :   **SEALED COMPLAINT**
                                :
                                :   Violation of
          - v. -                :   21 U.S.C. § 846
                                :
DEEYAZEN ABDULLA,               :   COUNTY OF OFFENSE:
    a/k/a "Qaleto,"             :   BRONX
and RICARDO FABIAN,             :
                                :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

GUS XHUDO, being duly sworn, deposes and says that he is a Special Agent with Homeland Security Investigations ("HSI"), and charges as follows:

**COUNT ONE**

1.   From on or about September 13, 2018 to and including on or about May 3, 2019, in the Southern District of New York and elsewhere, DEEYAZEN ABDULLA, a/k/a "Qaleto," and RICARDO FABIAN, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2.   It was a part and an object of the conspiracy that DEEYAZEN ABDULLA, a/k/a "Qaleto," and RICARDO FABIAN, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

3. · The controlled substances that DEEYAZEN ABDULLA, a/k/a "Qaleto," and RICARDO FABIAN, the defendants, conspired to distribute and possess with the intent to distribute were (a) 40 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(B); (b) mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(C); and (c) mixtures and substances containing a detectable amount of oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

4. I am a Special Agent with HSI, and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of reports, records, and recorded conversations. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Background of the Investigation

5. Since approximately July 2017, HSI, along with the New York City Police Department ("NYPD" and, together with HSI, the "Investigating Agencies") have been investigating the sale of controlled substances out of three bodegas in the Bronx, New York, which are principally operated by DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant. Based on my review of documents and my conversations with other law enforcement officers, I understand that ABDULLA and operates a bodega located on the Grand Concourse, in the Bronx, New York (the "Grand Concourse Bodega"), a bodega located at 229 East 181st Street, in the Bronx, New York (the "229 181st Street Bodega"), and a bodega located at 239 East 181st Street, in the Bronx, New York (the "239 East 181st Street Bodega" and, together with the Grand Concourse Bodega and the 229 181st Street Bodega, the

2

"Bodegas"); that ABDULLA typically works in one of the Bodegas during the hours they are open; and that employees of ABDULLA work at the Bodegas as well.

6.     During the course of this investigation, I and other law enforcement officers have worked with two confidential informants, "CI-1" and "CI-2." CI-1 and CI-2 are cooperating with law enforcement in exchange for financial compensation. CI-1 has provided information to law enforcement for approximately 17 years, and CI-2 has provided information to law enforcement for approximately ten years. Information provided by CI-1 and CI-2 has been corroborated by, among other things, law enforcement surveillance, body wire audio and video recordings, toll records, and the recovery of physical evidence.

7.     Based on my participation in this investigation, including in-person surveillance, review of reports prepared by other law enforcement officers, and conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

a.     Between on or about July 27, 2017, and on or about January 5, 2018, CI-1 and CI-2 conducted at least eleven purchases of cannabis oil from DEEYAZEN ABDULLA, a/k/a "Qaleto," in or near the Grand Concourse Bodega. ABDULLA is known to CI-1 and CI-2 as "Qaleto," and CI-1 and CI-2 have identified a photograph of ABDULLA as "Qaleto." These purchases were covertly audio and/or video recorded, and law enforcement agents conducted surveillance during these purchases as well.

b. On or about January 18, 2018, ABDULLA departed the United States on a flight ultimately bound for Oman. ABDULLA returned to the United States in or around August 2018. During the period that ABDULLA was out of the United States, CI-1 and CI-2 made at least ten additional purchases of cannabis oil from employees at the Bodegas.

## The Meetings With Abdulla Between August 2018 and January 2019

8.     Based on my review of reports prepared by other law enforcement officers, and conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

a.     On or about August 31, 2018, CI-1 and CI-2 entered the 229 181st Street Bodega, and observed DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant, working there. CI-1 and

3

CI-2 discussed their purchases of cannabis oil from other employees of the Bodegas with ABDULLA. ABDULLA stated, in sum and substance, that he was back in the United States and that he would accommodate whatever they wanted to purchase in the future. ABDULLA also provided CI-1 and CI-2 with a new cellphone number (the "ABDULLA Cellphone") and stated that they could contact him on that cellphone in the future.

b.     On or about September 13, 2018, CI-1 and CI-2 placed a call to the ABDULLA Cellphone. During the call, CI-1 and CI-2 discussed the purchase of 15 vials of cannabis oil from ABDULLA, in exchange for $500. ABDULLA instructed CI-1 and CI-2, in sum and substance, to come to the block of the 229 181st Street Bodega and call him when they were there.

c.     Later on that same date, CI-1 and CI-2 placed a call to the ABDULLA Cellphone, and were instructed by ABDULLA to meet him on the corner of East 181st Street and Anthony Avenue in the Bronx, New York, because, according to ABDULLA, the 229 181st Street Bodega was "hot."[1] Shortly thereafter, CI-1 and CI-2 met with ABDULLA at the designated street corner. Law enforcement officers conducted surveillance of the meeting and observed CI-1 and CI-2 meeting with a person they identified as ABDULLA, on the basis of known photographs of ABDULLA available to law enforcement.

d.     During the meeting on September 13, 2018, ABDULLA provided CI-1 and CI-2 with 15 vials of cannabis oil in exchange for $500 in cash, which had been provided to CI-1 and CI-2 by law enforcement. CI-1 and CI-2 then informed ABDULLA that they were not making much money selling cannabis oil and asked if he could provide them with something else. ABDULLA stated, in sum and substance, that he would work on getting them fentanyl. CI-1 and CI-2 later provided the vials of cannabis oil to law enforcement.

e.     Between September 13, 2018, and January 15, 2019, CI-1 and CI-2 had multiple additional meetings and telephone calls with ABDULLA. On multiple occasions during this time period, ABDULLA sold CI-1 and CI-2 cannabis oil and also oxycodone pills. ABDULLA also continued to engage in discussions

---

[1] Based on my training and experience, I understand that when an individual uses the term "hot" in reference to a location involved with criminal activity, it typically refers to the individual's concern that law enforcement may be watching that location.

4

with CI-1 and CI-2 about obtaining stronger narcotics to sell to them, including heroin and fentanyl.

## The January 15, 2019 Heroin and Hydrocodone Sale

9.   Based on my review of reports prepared by other law enforcement officers, my review of audio and video recordings, and my conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

a.   On or about January 15, 2019, CI-1 and CI-2 placed a call to the ABDULLA Cellphone. During the call, CI-1 and CI-2 discussed the purchase of 21 hydrocodone pills and one bundle of heroin from DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant, in exchange for $540. ABDULLA instructed CI-1 and CI-2, in sum and substance, to meet him later that day at the Grand Concourse Bodega.

b.   Later on that same date, CI-1 and CI-2 met with ABDULLA at the Grand Concourse Bodega. At this meeting, which was audio and video recorded, ABDULLA provided CI-1 and CI-2 with 21 hydrocodone pills, one vial of cannabis oil, and one bundle of heroin in exchange for $540 in cash, which had been provided to CI-1 and CI-2 by law enforcement. CI-1 and CI-2 asked ABDULLA, in sum and substance, if the heroin was good and if he would be able to get more of it. ABDULLA responded, in sum and substance, that he could obtain more heroin.

c.   Immediately after the meeting, CI-1 and CI-2 provided the hydrocodone pills, cannabis oil, and bundle of heroin to law enforcement officers. I have reviewed two laboratory reports prepared by NYPD chemists, and have learned that the bundle sold by ABDULLA on January 15, 2019, tested positive for the presence of heroin, and that the pills sold by ABDULLA on January 15, 2019, tested positive for the presence of hydrocodone.

## The January 18, 2019 Heroin and Oxycodone Sale

10.   Based on my review of reports prepared by other law enforcement officers, my review of audio and video recordings, and my conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

5

a. On or about January 18, 2019, CI-1 and CI-2 placed a call to the ABDULLA Cellphone. During the call, CI-1 and CI-2 discussed the purchase of 11 oxycodone pills and two bundles of heroin from DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant, in exchange for $500. ABDULLA instructed CI-1 and CI-2, in sum and substance, to meet him later that day at the Grand Concourse Bodega.

b. Later on that same date, CI-1 and CI-2 met with ABDULLA at the Grand Concourse Bodega. At this meeting, which was audio and video recorded, ABDULLA sold CI-1 and CI-2 11 oxycodone pills and two bundles of heroin in exchange for $500 in cash, which had been provided to CI-1 and CI-2 by law enforcement.

c. Immediately after the meeting, CI-1 and CI-2 provided the oxycodone pills and bundles of heroin to law enforcement officers. I have reviewed two laboratory reports prepared by NYPD chemists, and have learned that the bundles sold by ABDULLA on January 18, 2019, tested positive for the presence of heroin, and that the pills sold by ABDULLA on January 18, 2019, tested positive for the presence of oxycodone.

### The January 24, 2019 Heroin and Oxycodone Sale

11. Based on my review of reports prepared by other law enforcement officers, my review of audio and video recordings, and my conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

a. On or about January 24, 2019, CI-1 and CI-2 placed a call to the ABDULLA Cellphone in which they discussed the purchase of 15 oxycodone pills and four bundles of heroin from DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant, in exchange for $780. ABDULLA instructed CI-1 and CI-2, in sum and substance, to meet him later that day at the Grand Concourse Bodega.

b. Later on that same date, CI-1 and CI-2 met with ABDULLA at the Grand Concourse Bodega. At the direction of law enforcement, CI-1 and CI-2 carried covert audio and video recording equipment to this meeting. At this meeting, ABDULLA sold CI-1 and CI-2 15 oxycodone pills and four bundles of heroin in exchange for $780 in cash, which had been provided to CI-1 and CI-2 by law enforcement.

c. Immediately after the meeting, CI-1 and CI-2 provided the oxycodone pills and bundles of heroin to law enforcement officers. I have reviewed two laboratory reports prepared by NYPD chemists, and have learned that the bundles sold by ABDULLA on January 24, 2019, tested positive for the presence of heroin, and that the pills sold by ABDULLA on January 26, 2019, tested positive for the presence of oxycodone.

## The February 1, 2019 Heroin and Oxycodone Sale

12. Based on my review of reports prepared by other law enforcement officers, my review of audio and video recordings, and my conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

a. On or about February 1, 2019, CI-1 and CI-2 placed a call to the ABDULLA Cellphone in which they discussed the purchase of five oxycodone pills and five bundles of heroin from DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant, in exchange for $800. ABDULLA instructed CI-1 and CI-2, in sum and substance, to meet him later that day at the Grand Concourse Bodega.

b. Later on that same date, CI-1 and CI-2 met with ABDULLA at the Grand Concourse Bodega. At this meeting, which was audio and video recorded, ABDULLA sold them five oxycodone pills and five bundles of heroin in exchange for $800 in cash, which had been provided to CI-1 and CI-2 by law enforcement. In addition, CI-1 and CI-2 asked, in sum and substance, if ABDULLA could supply them with seven bundles of heroin the following week, and ABDULLA responded in the affirmative.

c. Immediately after the meeting, CI-1 and CI-2 provided the oxycodone pills and bundles of heroin to law enforcement officers. I have reviewed a laboratory report prepared by a NYPD chemist, and have learned that the bundles sold by ABDULLA on February 1, 2019, tested positive for the presence of heroin.

13. Based on my review of toll records provided by a cellphone company, my review of reports prepared by other law enforcement officers, my conversations with other law enforcement officers, and my participation in surveillance, I have learned the following, among other things:

7

a. Based on toll records for the ABDULLA
Cellphone, I have identified a cellphone (the "FABIAN
Cellphone") that has had contacts with the ABDULLA Cellphone in
a pattern that appears to be connected to ABDULLA's sales of
narcotics.

b. I have reviewed two police reports dated
February 8, 2018, and July 18, 2018, in which RICARDO FABIAN,
the defendant, provided the number for the FABIAN Cellphone as
his cellphone number. I have also reviewed subscriber
information for the FABIAN Cellphone, and have learned that it
is subscribed to an individual who lives at the same address as
FABIAN. In addition, on May 21, 2019, I and other law
enforcement officers conducted surveillance of FABIAN. During
that surveillance, a law enforcement officer placed a call to
the FABIAN Cellphone, and law enforcement observed FABIAN
answering his cellphone when that call was placed. It therefore
appears to me that FABIAN is the user of the FABIAN Cellphone.

c. Based on toll records, I have learned that on
February 1, 2019, the ABDULLA Cellphone placed two calls to the
FABIAN Cellphone and received a call from the FABIAN Cellphone
after receiving the call from CI-1 and CI-2 and prior to
ABDULLA's sale of narcotics to CI-1 and CI-2. I have also
learned that on February 2, 2019, the day after ABDULLA spoke
with CI-1 and CI-2 about obtaining additional heroin for them,
the ABDULLA Cellphone placed two calls to the FABIAN Cellphone.

## The February 5, 2019 Heroin Sale

14. Based on my review of reports prepared by other
law enforcement officers, my review of toll records, my review
of audio and video recordings, and my conversations with other
law enforcement officers who have debriefed CI-1 and CI-2, I
have learned, among other things, the following:

a. On or about February 5, 2019, CI-1 and CI-2
placed a call to the ABDULLA Cellphone in which they discussed
the purchase of six bundles of heroin from DEEYAZEN ABDULLA,
a/k/a "Qaleto," the defendant, in exchange for $800. ABDULLA
stated, in sum and substance, that he had the drugs ready for
pickup and instructed CI-1 and CI-2 to meet him later that day
at the Grand Concourse Bodega.

b. Shortly before the call between CI-1 and CI-2
on February 1, 2019, the ABDULLA Cellphone had placed a call to
the FABIAN Cellphone.

8

c. Later on that same date, CI-1 and CI-2 met with ABDULLA at the Grand Concourse Bodega. At this meeting, which was audio and video recorded ABDULLA provided CI-1 and CI-2 with six bundles of heroin in exchange for $800 in cash, which had been provided to CI-1 and CI-2 by law enforcement.

d. Immediately after the meeting, CI-1 and CI-2 provided the bundles of heroin to law enforcement officers. I have reviewed a laboratory report prepared by a NYPD chemist, and have learned that the bundles sold by ABDULLA on February 5, 2019, tested positive for the presence of heroin.

## The February 13, 2019 Heroin and Fentanyl Sale

15. Based on my review of reports prepared by other law enforcement officers, my review of toll records, my review of audio and video recordings, and my conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

a. On or about February 7, 2019, CI-1 spoke with DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant, in the Grand Concourse Bodega. During that conversation, CI-1 told ABDULLA, in sum and substance, that the heroin CI-1 had purchased from ABDULLA was of good quality. ABDULLA asked CI-1 if CI-1 was still interested in purchasing fentanyl, and CI-1 responded in the affirmative. ABDULLA then stated that he would speak with his contact about providing heroin with fentanyl. ABDULLA further stated that they should not refer to fentanyl by its name, but should call it "mango."

b. On or about February 13, 2019, CI-1 and CI-2 placed a call to the ABDULLA Cellphone in which they discussed the purchase of ten bundles of heroin from ABDULLA in exchange for $1,400. CI-1 and CI-2 asked ABDULLA if the heroin would have "mango" inside it, and ABDULLA stated that it would. ABDULLA instructed CI-1 and CI-2, in sum and substance, to meet him later that day at the Grand Concourse Bodega.

c. Following the call between CI-1 and CI-2, the ABDULLA Cellphone placed two calls to the FABIAN Cellphone.

d. Later on that same date, CI-1 and CI-2 met with ABDULLA at the Grand Concourse Bodega. At this meeting, which was audio and video recorded, ABDULLA provided CI-1 and CI-2 with ten bundles of heroin mixed with fentanyl in exchange for

9

$1,400 in cash, which had been provided to CI-1 and CI-2 by law enforcement. During the meeting, ABDULLA stated, in sum and substance, that the drugs had "mango" inside them, and further stated that "it is strong," and that CI-1 and CI-2 "should be careful not to kill anyone with it," "because people died from this on Burnside." Based on my conversations with other law enforcement officers, I understand that there have been multiple recent fentanyl overdose fatalities on Burnside Avenue in the Bronx.

e.     Immediately after the meeting, CI-1 and CI-2 provided the bundles of heroin and fentanyl to law enforcement officers. I have reviewed a laboratory report prepared by a NYPD chemist, and have learned that the bundles sold by ABDULLA on February 13, 2019, tested positive for the presence of heroin and fentanyl, and the weight of the narcotics was approximately 1.635 grams.

## The February 21, 2019 Heroin and Fentanyl Sale

16.    Based on my review of reports prepared by other law enforcement officers, my review of toll records, my review of audio and video recordings, and my conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

a.     On or about February 21, 2019, CI-1 and CI-2 placed a call to the ABDULLA Cellphone in which they·discussed the purchase of 15 bundles of heroin and fentanyl from DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant, in exchange for 2,100 dollars.

b.     Later on that same date, CI-1 and CI-2 met with ABDULLA at the Grand Concourse Bodega. At this meeting, which was audio and video recorded, ABDULLA provided CI-1 and CI-2 with 15 bundles of heroin mixed with fentanyl in exchange for $2,100 in cash, which had been provided to CI-1 and CI-2 by law enforcement.

c.     Immediately after the meeting, CI-1 and CI-2 provided the bundles of heroin and fentanyl to law enforcement officers. I have reviewed a laboratory report prepared by a NYPD chemist, and have learned that the bundles sold by ABDULLA on February 21, 2019, tested positive for the presence of heroin and fentanyl, and that the weight of the narcotics was approximately 4.920 grams.

10

## The February 26, 2019 Heroin and Fentanyl Sale

17.  Based on my review of reports prepared by other law enforcement officers, my review of toll records, my review of audio and video recordings, and my conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

a.  On or about February 26, 2019, CI-1 and CI-2 placed a call to the ABDULLA Cellphone in which they discussed the purchase of heroin and fentanyl from DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant.

b.  Later on that same date, CI-1 and CI-2 met with ABDULLA at the Grand Concourse Bodega. At this meeting, which was audio and video recorded, ABDULLA provided CI-1 and CI-2 with 20 bundles of heroin mixed with fentanyl in exchange for $2,800 in cash, which had been provided to CI-1 and CI-2 by law enforcement.

c.  Immediately after the meeting, CI-1 and CI-2 provided the bundles of heroin and fentanyl to law enforcement officers. I have reviewed a laboratory report prepared by a NYPD chemist, and have learned that the bundles sold by ABDULLA on February 26, 2019, tested positive for the presence of heroin and fentanyl, and that the weight of the narcotics was approximately 5.923 grams.

## The March 5, 2019 Heroin and Fentanyl Sale

18.  Based on my review of reports prepared by other law enforcement officers, my review of toll records, my review of audio and video recordings, and my conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

a.  On or about March 5, 2019, CI-1 and CI-2 placed a call to the ABDULLA Cellphone in which they discussed the purchase of heroin and fentanyl from DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant.

b.  Later on that same date, CI-1 and CI-2 met with ABDULLA at the Grand Concourse Bodega. At this meeting, which was audio and video recorded, ABDULLA provided CI-1 and CI-2 with 249 glassine envelopes of heroin mixed with fentanyl in exchange for $3,500 in cash, which had been provided to CI-1 and CI-2 by law enforcement.

c. Immediately after the meeting, CI-1 and CI-2
provided the glassines of heroin and fentanyl to law enforcement
officers. I have reviewed a laboratory report prepared by a NYPD
chemist, and have learned that the glassines sold by ABDULLA on
March 5, 2019, tested positive for the presence of heroin and
fentanyl, and that the weight of the narcotics was 4.257 grams.

### The March 12, 2019 Heroin and Fentanyl Sale

19. Based on my review of reports prepared by other
law enforcement officers, my review of toll records, my review
of audio and video recordings, and my conversations with other
law enforcement officers who have debriefed CI-1 and CI-2, I
have learned, among other things, the following:

a. On or about March 12, 2019, CI-1 and CI-2
placed a call to the ABDULLA Cellphone in which they discussed
the purchase of heroin and fentanyl from DEEYAZEN ABDULLA, a/k/a
"Qaleto," the defendant.

b. Later on that same date, CI-1 and CI-2 met with
ABDULLA at the Grand Concourse Bodega. At this meeting, which
was audio and video recorded, ABDULLA provided CI-1 and CI-2
with what he represented to be 30 bundles of heroin mixed with
fentanyl in exchange for $4,200 in cash, which had been provided
to CI-1 and CI-2 by law enforcement.

c. Immediately after the meeting, CI-1 and CI-2
provided the bundles of heroin and fentanyl to law enforcement
officers. Law enforcement officers counted the bundles and
discovered that there were 26 bundles of heroin and fentanyl in
the bag. At the direction of law enforcement, CI-1 and CI-2
placed a call to the ABDULLA Cellphone to ask ABDULLA about
there being fewer bundles than promised. On that call, ABDULLA
stated, in sum and substance, that his "guy" had told him there
were 30 bundles, and that he would tell his "guy" to bring the
difference. ABDULLA further instructed CI-1 and CI-2 to return
to the Grand Concourse Bodega later that evening.

d. Later that evening, CI-1 and CI-2 returned to
the Grand Concourse Bodega, where ABDULLA provided them with
three additional bundles. ABDULLA further stated, in sum and
substance, that his "guy" was only able to provide three more
bundles at that time, and they would work out the difference on
the next buy.

12

e.    I have reviewed a laboratory report prepared by
a NYPD chemist, and have learned that the 29 bundles sold by
ABDULLA on March 12, 2019, tested positive for the presence of
heroin and fentanyl, and that the weight of the narcotics was
approximately 5.954 grams.

## The March 22, 2019 Heroin and Fentanyl Sale

20.    Based on my review of reports prepared by other
law enforcement officers, my review of toll records, my review
of audio and video recordings, and my conversations with other
law enforcement officers who have debriefed CI-1 and CI-2, I
have learned, among other things, the following:

a.    On or about March 22, 2019, CI-1 and CI-2
placed a call to the ABDULLA Cellphone in which they discussed
the purchase of heroin and fentanyl from DEEYAZEN ABDULLA, a/k/a
"Qaleto," the defendant.

b.    Later on that same date, CI-1 and CI-2 met with
ABDULLA at the Grand Concourse Bodega. At this meeting, which
was audio and video recorded, ABDULLA provided CI-1 and CI-2
with 25 bundles of heroin mixed with fentanyl in exchange for
$3,500 in cash, which had been provided to CI-1 and CI-2 by law
enforcement.

c.    Immediately after the meeting, CI-1 and CI-2
provided the bundles of heroin and fentanyl to law enforcement
officers. I have reviewed a laboratory report prepared by a NYPD
chemist, and have learned that the bundles sold by ABDULLA on
March 22, 2019, tested positive for the presence of heroin and
fentanyl, and that the weight of the narcotics was approximately
4.525 grams.

## The April 3, 2019 Heroin and Fentanyl Sale

21.    Based on my review of reports prepared by other
law enforcement officers, my review of toll records, my review
of audio and video recordings, and my conversations with other
law enforcement officers who have debriefed CI-1 and CI-2, I
have learned, among other things, the following:

a.    On or about April 3, 2019, CI-1 and CI-2 placed
a call to the ABDULLA Cellphone in which they discussed the
purchase of heroin and fentanyl from DEEYAZEN ABDULLA, a/k/a
"Qaleto," the defendant.

13

b.     Later on that same date, CI-1 and CI-2 met with
ABDULLA at the Grand Concourse Bodega. At this meeting, which
was audio and video recorded, ABDULLA provided CI-1 and CI-2
with 27 bundles of heroin mixed with fentanyl in exchange for
$3,700 in cash, which had been provided to CI-1 and CI-2 by law
enforcement.

c.     Immediately after the meeting, CI-1 and CI-2
provided the bundles of heroin and fentanyl to law enforcement
officers. I have reviewed a laboratory report prepared by a NYPD
chemist, and have learned that the bundles sold by ABDULLA on
April 3, 2019, tested positive for the presence of heroin and
fentanyl, and that the weight of the narcotics was approximately
5.116 grams.

d.     The bundles of heroin and fentanyl sold by
ABDULLA on April 3, 2019, were packaged in a zip lock bag. Law
enforcement officers took this zip lock bag into evidence and
delivered it to the NYPD laboratory for fingerprint analysis. I
have reviewed a report prepared by a NYPD fingerprint examiner,
and have learned that the fingerprint examiner identified a
latent print on the zip lock bag as matching a fingerprint of
RICARDO FABIAN, the defendant.

## The April 10, 2019 Heroin and Fentanyl Sale

22.     Based on my review of reports prepared by other
law enforcement officers, my review of toll records, my review
of audio and video recordings, and my conversations with other
law enforcement officers who have debriefed CI-1 and CI-2, I
have learned, among other things, the following:

a.     On or about April 10, 2019, CI-1 and CI-2
placed a call to the ABDULLA Cellphone in which they discussed
the purchase of heroin and fentanyl from DEEYAZEN ABDULLA, a/k/a
"Qaleto," the defendant.

b.     Later on that same date, CI-1 and CI-2 met with
ABDULLA at the Grand Concourse Bodega. At this meeting, which
was audio and video recorded, ABDULLA provided CI-1 and CI-2
with 27 bundles of heroin mixed with fentanyl in exchange for
$3,700 in cash, which had been provided to CI-1 and CI-2 by law
enforcement.

c.     Immediately after the meeting, CI-1 and CI-2
provided the bundles of heroin and fentanyl to law enforcement
officers. I have reviewed a laboratory report prepared by a NYPD

chemist, and have learned that the bundles sold by ABDULLA on April 10, 2019, tested positive for the presence of heroin and fentanyl, and that the weight of the narcotics was approximately 12.931 grams.

## The April 18, 2019 Heroin and Fentanyl Sale

23. Based on my review of reports prepared by other law enforcement officers, my review of toll records, my review of audio and video recordings, and my conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

a. On or about April 18, 2019, CI-1 and CI-2 placed a call to the ABDULLA Cellphone in which they discussed the purchase of heroin and fentanyl from DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant.

b. Later on that same date, CI-1 and CI-2 met with ABDULLA at the Grand Concourse Bodega. At this meeting, which was audio and video recorded, ABDULLA provided CI-1 and CI-2 with 25 bundles of heroin mixed with fentanyl in exchange for $3,500 in cash, which had been provided to CI-1 and CI-2 by law enforcement.

c. Immediately after the meeting, CI-1 and CI-2 provided the bundles of heroin and fentanyl to law enforcement officers. I have reviewed a laboratory report prepared by a NYPD chemist, and have learned that the bundles sold by ABDULLA on April 18, 2019, tested positive for the presence of heroin and fentanyl, and that the weight of the narcotics was approximately 6.402 grams.

## The April 26, 2019 Heroin and Fentanyl Sale

24. Based on my review of reports prepared by other law enforcement officers, my review of toll records, my review of audio and video recordings, and my conversations with other law enforcement officers who have debriefed CI-1 and CI-2, I have learned, among other things, the following:

a. On or about April 26, 2019, CI-1 and CI-2 placed a call to the ABDULLA Cellphone in which they discussed the purchase of heroin and fentanyl from DEEYAZEN ABDULLA, a/k/a "Qaleto," the defendant.

15

b.      Later on that same date, CI-1 and CI-2 met with
ABDULLA at the Grand Concourse Bodega. At this meeting, which
was audio and video recorded, ABDULLA provided CI-1 and CI-2
with 25 bundles of heroin mixed with fentanyl in exchange for
$3,000 in cash, which had been provided to CI-1 and CI-2 by law
enforcement.

c.      Immediately after the meeting, CI-1 and CI-2
provided the bundles of heroin and fentanyl to law enforcement
officers. I have reviewed a laboratory report prepared by a NYPD
chemist, and have learned that the bundles sold by ABDULLA on
April 26, 2019, tested positive for the presence of heroin and
fentanyl, and that the weight of the narcotics was approximately
6.152 grams.

## The May 3, 2019 Heroin and Fentanyl Sale

25.     Based on my review of reports prepared by other
law enforcement officers, my review of toll records, my review
of audio and video recordings, and my conversations with other
law enforcement officers who have debriefed CI-1 and CI-2, I
have learned, among other things, the following:

a.      On or about May 3, 2019, CI-1 and CI-2 placed a
call to the ABDULLA Cellphone in which they discussed the
purchase of heroin and fentanyl from DEEYAZEN ABDULLA, a/k/a
"Qaleto," the defendant.

b.      Later on that same date, CI-1 and CI-2 met with
ABDULLA at the Grand Concourse Bodega. At this meeting, which
was audio and video recorded, ABDULLA provided CI-1 and CI-2
with ABDULLA sold them 25 bundles of heroin mixed with fentanyl
in exchange for $3,000 in cash, which had been provided to CI-1
and CI-2 by law enforcement. During this meeting, CI-1 and CI-2
inquired whether they could meet ABDULLA's "guy," who was
supplying the narcotics to ABDULLA. ABDULLA responded, in sum
and substance, that his "guy" was nervous about meeting with
people he did not know, so it was unlikely the "guy" would meet
directly with CI-1 and CI-2.

c.      Immediately after the meeting, CI-1 and CI-2
provided the bundles of heroin and fentanyl to law enforcement
officers. I have reviewed a laboratory report prepared by a NYPD
chemist, and have learned that the bundles sold by ABDULLA on
May 3, 2019, tested positive for the presence of heroin and
fentanyl, and that the weight of the narcotics was approximately
5.766 grams.

16

## The Aggregate Weight of Fentanyl

26. In total, based on the laboratory reports described above, I have learned that DEEYAZEN ABDULLA, a/k/a "Qaleto," personally distributed more than 63 grams of mixtures and substances containing fentanyl to CI-1 and CI-2.

WHEREFORE, I respectfully request that warrants be issued for the arrest of DEEYAZEN ABDULLA, a/k/a "Qaleto," and RICARDO FABIAN, the defendants, and that they be imprisoned or bailed, as the case may be.

GUS XHUDO
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Sworn to before me this
24th day of May, 2019

THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

17